May it please the court, good morning. Good morning, counsel. My name is Dan Donovan. I'm from Great Falls, Montana. I represent the appellate defendant, Francisco Frank Valencia. We raised two issues on appeal here, number one being the sufficiency of the evidence, number two being an evidentiary issue, and I'll address those issues in that order if I may. In denying Mr. Valencia's Rule 29 motion at the district court level, the court specifically found that the victim's testimony, quote, was corroborated by DNA evidence. We disagree with that strongly. We feel that the DNA evidence did not corroborate the victim, at least the way we view it, primarily because there was no DNA analysis of the possible sex partners with Mr. Valencia, that being his wife Ida, as well as the alleged victim. There was no DNA found in the alleged victim's panties, despite the fact that there was DNA found in the shorts. Yeah, I wanted to ask you about that. All right. In terms of linking up, I recognize that they didn't, like, cross-reference with other possible partners, but I thought, in effect, that that might have been cured by the testimony and the situation on the shorts. But you obviously don't think so. About the possible? Well, in terms of linking it to this particular person. Okay. And timing. Well, it was about two months prior to the alleged incident that we had defense testimony that the wife Ida had sexual relations in the same bed with Frank, and then there was another piece of evidence, which was at issue, was whether the shorts would have been washed or the same between that time. We think it's significant, though, that the fact that the shorts, from the testimony, indicate that the size was small, and from the testimony, the wife Ida fit into small-type shorts, whereas the victim, who was larger, bigger, and wore bigger sizes, did not. Testimony wasn't there that this maybe meant short rather than small? I think there's testimony to that, Your Honor, but I don't know if that actually ties in with the, and I know there wasn't any expert testimony on garment manufacturing, but to my limited knowledge, if a manufacturer puts S and 32 on a pair of pants, that means shorts and inseam length 32, not shorts. And these, in fact, as I understand from the record, were cut-off shorts, so they were apparently longer pants. But there is some testimony that they were a short style of longer pants, which does conflict. And the jury couldn't believe either one. Pardon me? The jury couldn't believe either one. That's correct, Your Honor. That's correct. But we feel that it wasn't corroboration and that it did raise a reasonable doubt. And, again, it's already been brought up. The laboratory did find evidence of female DNA in the shorts, but that was never connected or tested to compare it to either Ida or the victim. We contend also in this case that the victim had very low, if not nonexistent, credibility, particularly with evidence from her close family members. She was described as a liar. Her closest relatives said that they did not believe anything she had to say. She's described as not being truthful, that she manipulates a lot. She was said to live in her own fantasy world, and she even admitted that she fantasized during the sexual encounter. And she also admitted that crazy things popped into her head. So we contend that really what's important here, usually a witness's testimony does not have to be corroborated. But in this particular situation, with the lack of the corroboration of the female DNA, as well as the size of the shorts, that her story was incredible and it wasn't corroborated. Well, how much of this did the jury hear as to her unreliability? They heard a significant amount, Your Honor, from I think two, three of her aunts, one cousin, and one uncle. And there was extensive testimony about her unreliability. No question about that. It's kind of hard to overcome a jury's prerogative to believe or disbelieve. I recognize that, and there's really limited case law on the point. It usually is a jury question, and there's a case I quote in my brief about the witness being so shoddy that they can't be believed, and that's what I'm trying to approach in this case, perhaps not successfully. If I may move on to the second issue, we contend that evidence of a prior false accusation of sexual abuse against another family member was improperly excluded by the trial court. We feel that it bore directly on the biases and motives of both the alleged victim and her mother and demonstrated that there were possible biases and motives of that, of those two people to testify against Mr. Valencia. And it directed, it went directly to the personalities of the people in the case, not the word personalities as in the Davis versus Alaska opinion. And the family dynamics here, I believe, was all important. What really was excluded was not extrinsic evidence of this other alleged false accusation, but actually an overheard conversation between the alleged victim and her mother that was overheard by her Aunt Carol, and then when testimony started to get into what that was, it was excluded by the district court. But I thought the, you know, I would tend to agree with you that that would be highly relevant, obviously because part of your whole theory here is the credibility, and that goes directly to, you know, why she's here and why she's making the accusations. I guess the difficulty I had, and one you could respond to, is I thought at trial they still were able to essentially ask that question to Bonnie, and Carol got to testify to some degree on that about her being forced to, you know, go ahead with these charges against Valencia. So with that testimony that did get in, I guess my question is whether in the end how prejudicial it was to have the direct conversation excluded. It got in, but the details of the situation didn't get in, and I think if I may elaborate a little bit, but when, in our society, when we grow up, we're taught and we learn about how to detect if somebody's telling the truth or somebody's lying, and we learn about these sort of things from teachings, religious-type teachings from the Bible, and that sort of thing, for example, the Susanna and the Elder story in the Bible, we learn through experience to try to detect if somebody's lying, if they look you in the eye when they say something, or the old story of the crumbs by the cookie jar that the kid stole some cookies out of the cookie jar. In this situation, I think it's most analysis to the old story that we all hear when we grow up called the boy who cried wolf. If this so-called victim made a similar claim before and now has made another claim, that really brings the whole story into doubt, and I think when you have a jury trial and you tell the jury to take all their life experiences and use their common sense and apply that to what they hear in the courtroom, that's why I think this part of the defense story was so important to hear exactly what this conversation was, what this apparent plot was or discussion was between mother and daughter about some sexual allegations that were false against the victims' grandfather and the mother's father. Did you want to reserve some time for rebuttal?  Good morning. My name is Lori Sook, and I'm from Great Falls, Montana. I'm an assistant United States attorney there, and I tried the case. This is a case of the failure of the United States to investigate the obvious has created a defense that we're now still dealing with on appeal, and let me explain. We failed to get a sample from the victim in this case. The DNA testing came back, and the obvious was that we had been provided with the shorts from the victim. It certainly was not our normal procedure not to get that sample from the victim, but it truly wasn't predicted by the United States that this would be the defense, and that's what we faced at trial, and we faced a vigorous defense. The testimony of the wife of the defendant, the mother of the defendant, created this defense, but there were problems with it. That was that the wife couldn't identify the shorts as the ones she'd worn specifically, and the timing of it, that if, in fact, she had worn shorts that were at the house of the victim, it was months before this incident had occurred. There was an attempt made to characterize these shorts as not having been able to be worn by the victim because of the size. That was, again, something that we had to deal with, and we dealt with it with the question, well, if this S doesn't mean small, what could it mean? And the testimony through the mother was that it was a pair of short pants that she'd cut off into shorts, and the S could mean short, and the 32 could mean waist size. Did anybody measure the shorts? They weren't. No, they weren't measured. Maybe it was a glove trick. No, no, she didn't try them on at trial. This was, I have to be honest, an ingenious defense, and we were dealing with it as the issues came up, but there were problems with it, and the jury heard those problems, the timing of when she wore those shorts, and the fact that it all revolved around a conspiracy theory between the victim and her mother, and there were problems with that as well because there would have had to have been other people involved from the facts, let me explain. The first person she disclosed to was the nurse in the hospital. Now, Mr. Donovan has made a point in his rebuttal that, well, they could have had that conversation before, but that disclosure to the nurse and then to the FBI agent at the hospital didn't provide a description of the clothes other than that she was wearing shorts and a shirt. And prior to or about at the same time that that was occurring, the defendant was being interviewed by the criminal investigator, and he did provide a description of the clothing and that he was there, this is what she was wearing, but denied the sexual act. And then several days later when the investigators came to collect the clothing, they were provided with a pair of shorts that matched the description of the defendant, yet that information wasn't shared with the victim and her mother. So there was a conspiracy theory that was falling apart because other individuals had to be involved. The point is that the jury heard all of this. They heard all of this evidence and they chose to believe the victim. Why? Because her story was corroborated by the DNA evidence, in part was corroborated by the defendant's statement, and the conspiracy theory and the defense had holes in it. With respect to the second issue, which is the confrontation clause violation that's alleged. In hindsight, there is relevance to this question, but what was also happening, as you'll see in the record, is there were questions at the same time coming up about the mental health of the mother and her manipulation through these mental health issues of the victim. And that's coupled with the fact that the conspiracy theory by that time, when Carol Myers came on the stand to testify about the substance of the conversation, what the trial court had in front of it was the fact that this theory that the shorts were actually worn by his wife, which is the only way that this, in my mind, that the trial could be relevant, had fallen apart. It just wasn't plausible. Let me ask this question. The waist size was 32. That's the best explanation we could come up with. It was S-32. The defense believed that was small and the length of the pants or the inseam was 32. And my cross-examination of that was could it mean short and waist size 32? But the pants weren't measured. There was no testimony from the manufacturer or somebody from J.C. Penney's or somewhere else as to how pants are sized. No. Did they ever measure shorts by, like, a 32? Well, as the testimony tells you, they were actually a pair of pants that were cut off into shorts. And, yes, you can have a waist size of 32. Actually, jeans and pants do sometimes have the number as the waist size on there versus just the length of the inseam. So that was an option in my explanation of that. But there was testimony from both the mother and the victim that these were their shorts and they both wore them. Now, a 32 waist is a pretty good size waist for either a girl or a mother. It would fit about the sizes that they were talking about, in my mind, anywhere from the 11 to 16 range that she said she was wearing. And that was our ability to confront that evidence. That was my tactic, is to try and explain some other explanation for it. But were the shorts evidence? They were. Why didn't you measure them? In hindsight, I don't know. Okay. The jury saw the victim and the mother, and they had the shorts. I can only tell you that, from my perspective, it didn't jump out to me that these shorts couldn't be worn by this victim. The jury had that evidence as well. Whether S means small or short or anything else, if there was some reasonable, if they looked at the shorts and there was a chance she could fit in them. Sure. But they weren't some little, skinny little things. No, they were not. So the testimony was that she wouldn't wear a size small. Right. Which was obvious by her. By her bill. And the jury saw her and saw the shorts. In sum, we believe that the jury heard all of the good and the bad regarding the victim. They heard this defense, and they chose to return a verdict of guilty. Well, but they didn't hear about the conversation between the girlfriend and her mother about trying to set somebody up. They heard, they didn't hear the specific conversation, but they did hear the question to Bonnie Myers, have you ever had a conversation with your daughter about setting someone up? And then they heard to the point, before my objections were sustained, that she had overheard a conversation, Carol Myers, between Buffy and her mother. But they didn't hear the substance of the conversation. Well, without the substance, it didn't mean much. It did, because what the jury heard was that there was an allegation that they made up a prior sex abuse claim together against a family member. Why wouldn't that be quite relevant? At the time, as I was saying, the questions, as you look at them coming down, they were interspersed, and I went back to the records to try and figure out why I thought these were irrelevant questions. And the only thing that I can come up with is that they were asking questions about the mental health of the mother, as well, and her manipulation in the context of this, which I thought was prejudicial and irrelevant. And I also believed at that time that there was no basis for this conspiracy theory. What I considered to be their best witness, the mother of the defendant, who would place the defendant and his wife at that house where she could have had the opportunity to wear those shorts, had placed them there two months before. I guess this case represents the old maxim, be careful you might get what you ask for, and the judge sustained the objection. Yes. Any further questions? I think not. Thank you. Thank you. I'd just like to make two quick points. First, the question about the conversation really isn't in evidence because the jury, I haven't had time to check, but the jury is generally instructed to not regard the questions of counsel as evidence, number one. And secondly, certainly the defense could not argue that as evidence during the closing argument. The last thing I'd just like to point out, the so-called if it doesn't fit, you must acquit. One thing here I think that created a problem was the alleged incident occurred in July of 1997. We claim that the wife, Ida, and my client, Francisco, had sex together two months before that in May, but the trial was not until March of 2002, five years later. So I don't think there really was a way for somebody to try on those clothes five years later and have that make any sense. Thank you very much. Thank you. United States v. Valencia submitted.
judges: Hug, B Fletcher, McKeown